UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

BILL ROY HENDERSON,
    *Plaintiff*,

v.

ANGEL QUIROS, et al.
    *Defendants*.

No. 3:21-CV-1078 (VAB)

## INITIAL REVIEW ORDER

On August 10, 2021, Bill Roy Henderson ("Plaintiff"), an inmate[1] in the custody of the Connecticut Department of Correction ("DOC") at the Corrigan-Radgowski Correctional Center, brought this *pro se* action under 42 U.S.C. § 1983. *See* Compl., ECF No. 1 (Aug. 10, 2021) ("Compl.").[2]

Mr. Henderson alleges that Angel Quiros, Robert Martin, Dr. Gerald A. Valletta, Lieutenant Jusamme, Dr. Johnny Wu, and Dr. Ingrid Feder violated his rights under the Eighth and Fourteenth Amendments of the U.S. Constitution[3] and Article First, Sections 8 and 9 of the Connecticut Constitution. *See id.* ¶¶ 2–13, 68–73. Specifically, Mr. Henderson alleges that Defendants displayed deliberate indifference to his serious medical needs by not issuing him a

---

[1] The Court may "take judicial notice of relevant matters of public record." *See Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012). The Connecticut DOC website shows that Mr. Henderson was sentenced to sixty years of incarceration on March 22, 2002. *See* http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=210215 (last visited November 10, 2021).

[2] Mr. Henderson paid the filing fee on August 12, 2021.

[3] In his Complaint, Mr. Henderson does not specifically allege violation of his rights under the Fourteenth Amendment of the U.S. Constitution as relevant to his medical needs. The Court, however, construes his claim as including a Fourteenth Amendment claim, which renders the Eighth Amendment applicable to the states. *See Estelle v. Gamble*, 429 U.S. 97 (1976) (internal citation omitted); *see also Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (Complaints filed by *pro se* plaintiffs "must be construed liberally and interpreted to raise the strongest arguments that they suggest." (internal citation omitted)).

suitable mattress or mattress topping for his back pain and by denying him a single cell that he needed due to his sleep apnea. *See id.* ¶ 2. He also indicates that he is asserting a claim under the Equal Protection Clause of the Fourteenth Amendment based on the denial of a suitable mattress and single cell. *Id.* Mr. Henderson has requested relief including, *inter alia*, damages, declaratory judgment, and injunctive relief. *Id.* ¶¶ 74–82.

For the following reasons, the Complaint is **DISMISSED** without prejudice to renewal.

I.  BACKGROUND

In his Complaint, Mr. Henderson states that Angel Quiros ("Commissioner Quiros") is Commissioner of the DOC ; Robert Martin ("Warden Martin") is the warden at Corrigan-Radgowski Correctional Center; Dr. Gerald A. Valletta ("Dr. Valletta") is a doctor at Garner Correctional Center; Lieutenant Jusamme ("Lieutenant Jusamme") is a lieutenant at Corrigan-Radgowski Correctional Center; Dr. Johnny Wu ("Dr. Wu") is director of medical services at Correctional Managed Health Care and the DOC ("Dr. Wu"); and Dr. Ingrid Feder ("Dr. Feder") is a physician at Corrigan-Radgowski Correctional Center. *See id.* at ¶¶ 2–13, 28, 68–73.

Mr. Henderson's claims against these individuals arise from alleged periods of incarceration at MacDougall-Walker Correctional Institution ("MacDougall") and Garner Correctional Institution ("Garner"), *see id.* ¶ 1, as well as Corrigan-Radgowski Correctional Center ("Corrigan"), *see generally id.* ¶¶ 53–60. The factual background for each of Mr. Henderson's claims, arising from his alleged conditions of back pain and sleep apnea, will be reviewed below.

Back Pain

Mr. Henderson allegedly has experienced "unbearable" back pain since early 2002. *Id.* ¶ 15. The pain allegedly started after he had to sleep on DOC mattresses, allegedly only designed to support seventy pounds of pressure before reaching maximum compression. *Id.* ¶¶ 15, 16, 19.

Mr. Henderson and other inmates allegedly are locked in a cell for twenty-one to twenty-two hours per day and spend a large portion of their time lying on a mattress. *Id.* ¶¶ 17, 18. A new mattress allegedly reaches its maximum compression in as little as ten to fourteen days, at which point the mattress provides little or no support for inmates. *Id.* ¶¶ 22–23. Mr. Henderson allegedly has found that a compressed mattress feels similar to a steel platform, which allegedly aggravates his mid- to lower-back. *Id.* ¶ 23. The polyester batting core material allegedly bunches up in areas and leaves hard lumps that put painful pressure on his hips, legs, and back. *Id.* ¶ 24. The vinyl covering also allegedly cracks and tears, thereby leaving sharp edges along the top and sides, which allegedly cause pain. *Id.* ¶ 25.

Mr. Henderson allegedly wrote to medical staff and the warden of MacDougall, among other administrative prison staff, requesting a foam core or double mattress for his back pain in 2002 and 2009, but he allegedly never received a response. *Id.* ¶¶ 43–47.

In November 2009, Mr. Henderson allegedly was transferred to Garner Correctional Institution, where he allegedly continued to write to officials about his back pain. *Id.* ¶ 49. Allegedly, most of his correspondence was not answered, and he did not receive any improved or new medical treatment. *Id.*

On July 13, 2016, Dr. Valletta allegedly recommended that Mr. Henderson write to custody officials to request a new foam core mattress or a double mattress. *Id.* ¶ 50. Thereafter,

3

Mr. Henderson allegedly wrote to the warden at Garner, as well as the unit manager, to request a new foam core mattress or a double mattress, but his request went unanswered. *Id.* ¶ 51. The Garner Warden later allegedly advised him during a unit tour that he should contact the medical unit about his mattress needs. *Id.*

In 2017, Mr. Henderson allegedly learned that Inmates Thomas Marra and Taylor Dunbar received double mattresses from custody officials. *Id.* ¶ 52.

On or about December 13, 2018, Mr. Henderson allegedly was transferred from Garner to Corrigan. *Id.* ¶ 53. In 2019 and 2020, Mr. Henderson allegedly wrote several requests to the medical unit for medication and a double mattress/foam core mattress. *Id.* ¶ 55.

On November 4, 2020, Dr. Feder allegedly responded to one of his requests. *Id.* She allegedly indicated that a foam core "extra hard" mattress was available and that she had informed custody officials that this mattress would be appropriate for Mr. Henderson. *Id.* ¶ 56; *see also* Ex. D to Compl., ECF No. 1-1 (Aug. 10, 2021). No action, however, allegedly was taken to provide Mr. Henderson with this mattress. *See id.*; *see also* Compl. ¶ 56.

In January 2021, Mr. Henderson allegedly wrote a request to Warden Martin requesting either a double or foam core mattress. *Id.* ¶ 57. Warden Martin allegedly responded that a special mattress request required a doctor's order and that DOC did not otherwise issue double mattresses. *Id.*

Mr. Henderson allegedly filed a grievance on January 20, 2021. *Id.* ¶ 58. He allegedly received a response stating that a foam core mattress had been ordered on January 11, 2021. *Id.* Mr. Henderson allegedly received a new mattress, but he allegedly found that it caused him more pain than his prior mattress because it was "as hard as a rock." *Id.* ¶ 59.

Mr. Henderson allegedly has since written to the Corrigan medical doctor, explaining that his replacement mattress is so hard that it causes him more pain than his previous defective mattress. *Id.* ¶ 60. Dr. Rader allegedly responded by stating that he would prescribe a muscle relaxer for thirty days. *Id.*

Commissioner Quiros, Warden Martin, Dr. Valletta, Lieutenant Jusamme, Dr. Wu, and Dr. Feder allegedly are all aware of the defective mattresses as a result of numerous inmate complaints. *Id.* ¶ 26.

Before management of Correctional Managed Health Care ("CMHC") by Dr. Johnny Wu, medical staff allegedly could prescribe a "double mattress," "foam egg crate" and/or a mattress topping for inmates with back, hip, leg, neck or shoulder problems. *Id.* ¶ 28.

   Sleep Apnea

Mr. Henderson allegedly suffers from severe apnea; he received a diagnosis for the condition in 2013 after a sleep test at UConn Medical Center. *Id.* ¶¶ 30, 61. DOC allegedly has a policy to provide accommodations for inmates with sleep apnea. *Id.* ¶¶ 31, 32, 34, 38. DOC policy for inmates with sleep apnea allegedly includes the provision of an in-cell CPAP machine, as well as a single cell for sleeping due to the "well known" conflicts between inmates with sleep apnea and their cellmates. *Id.* Allegedly, inmates—such as Terence Tyson, who is specifically named in the Complaint—receive accommodations under this DOC policy. *Id.*

Inmates allegedly may make a request for a reasonable accommodation by filing a "Request for Reasonable Accommodations" form, which is allegedly then approved by Commissioner Quiros, Warden Martin, or any captain, lieutenant, or other staff in charge of an inmate's housing unit. *Id.* ¶¶ 33–35.

On September 8, 2020, Mr. Henderson allegedly filed a Request for Reasonable Accommodation due to conflict with his cellmates and sleep deprivation. *Id.* ¶ 62; *see also* Ex. H to Compl., ECF No. 1-1 (Aug. 10, 2021). He allegedly received a response that his request had been referred to the medical unit for review of a CPAP machine. *See id.* Mr. Henderson also allegedly spoke to Defendants in person about his sleep apnea and need for a single cell on June 2, 2009; November 2, 2020; and March 9, 2021. *Id.* ¶ 63.

Defendants allegedly all were aware of Mr. Henderson's sleep apnea diagnosis. *Id.* ¶ 36. Mr. Henderson allegedly has been deprived of sleep because his cellmates wake him up to complain about his snoring. *Id.* ¶ 39. The constant complaining and conflict with cellmates allegedly is causing Mr. Henderson mental stress. *Id.*

On December 15, 2020, Mr. Henderson allegedly filed a grievance concerning the denial of his requests for a single cell to accommodate his sleep apnea. *Id.* ¶ 64. Mr. Henderson allegedly has not, however, been provided with a single cell. *Id.* ¶¶ 63–67; *see also* Ex. I to Compl., ECF No. 1-1 (Aug. 10, 2021); Ex. J to Compl., ECF No. 1-1 (Aug. 10, 2021).

**II. STANDARD OF REVIEW**

Under 28 U.S.C. § 1915A(b), district courts must review prisoners' civil complaints against governmental actors and *sua sponte* "dismiss . . . any portion of [a] complaint [that] is frivolous, malicious, or fails to state a claim upon which relief may be granted," or that "seeks monetary relief from a defendant who is immune from such relief." *Id.*; *see also Liner v. Goord*, 196 F.3d 132, 134 & n.1 (2d Cir. 1999) (explaining that, under the Prisoner Litigation Reform Act, *sua sponte* dismissal of frivolous prisoner complaints is mandatory); *Tapia-Ortiz v. Winter*,

185 F.3d 8, 11 (2d Cir. 1999) ("Section 1915A requires that a district court screen a civil complaint brought by a prisoner against a governmental entity or its agents and dismiss the complaint *sua sponte* if, *inter alia,* the complaint is 'frivolous, malicious, or fails to state a claim upon which relief may be granted.'" (quoting 28 U.S.C. § 1915(a) & (b)(1))). This standard of review "appl[ies] to all civil complaints brought by prisoners against governmental officials or entities regardless of whether the prisoner has paid [a] filing fee." *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004) (internal quotation marks and citation omitted).

Rule 8 of the Federal Rules of Civil Procedure requires that a plaintiff plead only "a short and plain statement of the claim showing that the pleader is entitled to relief," *see* Fed. R. Civ. P. 8(a)(2), to provide the defendant "fair notice of what the . . . claim is and the grounds upon which it rests," *see Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Although the Federal Rules of Civil Procedure do not require "detailed factual allegations," a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555–57. Plausibility at the pleading stage is nonetheless distinct from

probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claim] is improbable, and . . . recovery is very remote and unlikely." *Id*. at 556 (internal quotation marks and citation omitted).

Complaints filed by *pro se* plaintiffs, however, "must be construed liberally and interpreted to raise the strongest arguments that they suggest." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)) (internal quotation marks omitted); *see also Tracy v. Freshwater*, 623 F.3d 90, 101– 02 (2d Cir. 2010) (discussing the "special solicitude" courts afford pro se litigants).

### III. DISCUSSION

Mr. Henderson has asserted Eighth Amendment and Fourteenth Amendment claims against Defendants in their individual and official capacities. The Court will review each of these claims below.

#### A. The Eighth Amendment Deliberate Indifference Claim

To state a claim of deliberate indifference to health or safety under the Eighth Amendment, an inmate must demonstrate both an objective and a subjective element. *See Farmer v. Brennan*, 511 U.S. 825, 834, 836–37 (1994) (internal quotation marks and citations omitted). To meet the objective element, an inmate must allege that he was incarcerated under conditions that resulted in a "sufficiently serious" deprivation, such as the denial of a "life[ ] necessit[y]" or a "substantial risk of serious harm." *Id.* To meet the subjective element, an inmate must allege that the defendant prison officials possessed culpable intent, that is, the officials knew or should have known that he faced a substantial risk to his health or safety. *See id.* at 834–37.

Thus, an allegation of "mere[ly] negligen[t]" conduct is insufficient. *Id.* at 835. Rather, the subjective element requires that a plaintiff allege that prison officials acted with "a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) (citing *Farmer*, 511 U.S. at 839–40).

1. Mattress

Because "sleep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment," a prisoner can raise a constitutional claim that his mattress is "so inadequate as to constitute an unconstitutional deprivation." *See Walker v. Schult*, 717 F.3d 119, 127 (2d Cir. 2013). To establish an Eighth Amendment claim alleging a deficient mattress, courts have required a prisoner plaintiff to allege either (1) a medical condition requiring a non-standard mattress to protect against further serious damage to the prisoner's health or (2) a medical condition caused by the inadequate mattress. *See Jones v. City of New York*, No. 18-CV-1937 (VSB), 2020 WL 1644009, at *7 (S.D.N.Y. Apr. 2, 2020) (internal citations omitted); *see also Rivera v. Doe*, No. 16-CV-8809 (PAE) (BCM), 2018 WL 1449538, at *7 (S.D.N.Y. Feb. 26, 2018) ("To succeed on a claim involving an alleged deficient bed, a plaintiff must allege that '[he or she] had a medical condition requiring a non-standard bed to protect against serious damage to his future health' or 'that the medical condition was itself created by an inadequate bed or mattress.'" (internal quotation omitted)).

For initial review purposes, Mr. Henderson sufficiently has alleged that he had an objectively serious need for a non-compressed mattress because his compressed mattress caused sleep deprivation and severe back pain. *See Jones*, 2020 WL 1644009, at *8 (finding objective element satisfied where allegations "g[a]ve rise to a plausible, common-sense inference that the

9

standard-issue mattress either exacerbates or causes Plaintiff's chronic and substantial back pain").

Mr. Henderson has not sufficiently alleged facts, however, indicating that Dr. Valletta and Dr. Feder acted with deliberate indifference to Mr. Henderson's need for a specialized mattress or mattress topping due to his back pain. He alleges only that Dr. Valletta recommended that he make a request for a special mattress from custody, although Mr. Henderson was later informed that custody does not handle such issues. Compl. ¶¶ 50–51. Thus, Mr. Henderson has alleged that Dr. Valletta acted, at most, negligently by providing him with erroneous information, which is not sufficient to state a claim of deliberate indifference.

Likewise, Mr. Henderson's allegations suggest that Dr. Feder responded to his request and indicated that a foam core "extra hard" would be appropriate, but that he later found the replacement mattress provided to him to be worse than his prior mattress. *Id.* ¶¶ 56, 59, 60. To the extent that these allegations suggest that Dr. Feder recommended an inappropriate mattress for his needs, they also suggest that Dr. Feder attempted to provide him with a new mattress in response to his requests. Thus, Mr. Henderson's allegations indicate that Dr. Feder may have acted negligently, but the alleged facts raise no suggestion that she acted with conscious disregard of Mr. Henderson's serious need for specialized bedding for his back pain.

In addition, Mr. Henderson has alleged that Warden Martin acted with deliberate indifference by stating that DOC did not issue double mattresses and that a special mattress required a doctor's order. *Id.* ¶ 57. Warden Martin's alleged response indicates that he instructed Mr. Henderson about how he could obtain a foam core mattress, which fails to suggest that Warden Martin acted with a conscious disregard to Mr. Henderson's need for a mattress to

10

relieve his back pain.

Mr. Henderson has not alleged any facts about deliberately indifferent conduct by Defendants Quiros, Jusamme, or Wu in regard to his back pain. Although he appears to assert that Dr. Wu's management policies have resulted in the alleged deprivation of an appropriate mattress, *see id.* ¶ 28, Mr. Henderson has not alleged any facts showing that Dr. Wu had any subjective knowledge that his actions posed a substantial risk of serious harm to Mr. Henderson, *see Tangreti v. Bachman*, 983 F.3d 609, 616 (2d Cir. 2020) ("[F]or deliberate-indifference claims under the Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it." (internal citation omitted)).

Accordingly, Mr. Henderson has not alleged a plausible Eighth Amendment claim based on failure to provide him with an adequate mattress to relieve his back pain against any Defendant in his or her individual capacity. *See* 28 U.S.C. § 1915A.

2. Sleep Apnea

Similarly, and even if he has adequately alleged a serious risk of harm based on sleep deprivation, Mr. Henderson has not alleged any facts to suggest that Defendants acted with a conscious disregard to the risk of harm arising from a failure to provide him with a single cell or a CPAP machine. Although Mr. Henderson attaches inmate requests and grievances relevant to his efforts to obtain a single cell and a CPAP for his sleep apnea, he does not allege or provide any facts to suggest that the Defendants had subjective knowledge that the lack of these requested accommodations posed a substantial risk of harm. *See Tangreti*, 983 F.3d at 616. At most, he alleges that Commissioner Quiros, Robert Martin, Dr. Valletta, Lieutenant Jusamme,

Dr. Wu, and Dr. Feder knew about his sleep apnea diagnosis and the resulting conflict he experienced with cellmates due to his snoring. *See* Compl. ¶¶ 36–38. These allegations alone, without an allegation that Defendants knew that their actions exposed Mr. Henderson to a substantial risk of serious harm, are insufficient to state a claim upon which relief can be granted. *See Tangreti*, 983 F.3d at 616 ("[F]or deliberate-indifference claims under the Eighth Amendment against a prison supervisor, the plaintiff must plead and prove that the supervisor had subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it." (internal citation omitted)).

Accordingly, as Mr. Henderson has not alleged that any of the named Defendants acted with deliberate indifference to a substantial risk of harm to him, the Court will dismiss his Eighth Amendment claims.[4] *See* 28 U.S.C. § 1915A.

---

[4] To the extent that Mr. Henderson's allegations may be construed to assert a claim under the Americans with Disabilities Act ("ADA"), he has not alleged a plausible ADA claim. Under Title II of the ADA, "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To establish a violation of Title II of the ADA, a plaintiff must show "(1) that he is a 'qualified individual' with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability." *Hargrave v. Vermont*, 340 F.3d 27, 34–35 (2d Cir. 2003) (internal citation omitted). State prisons qualify as public entities under the ADA. *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998); *see also* 28 C.F.R. § Pt. 35, App. B (2011) ("[T]itle II applies to anything a public entity does."). Even if he could be considered a "qualified individual" based on his sleep apnea, Mr. Henderson's allegations do not satisfy the ADA analysis because his allegations fail to suggest that any Defendants excluded him from participation in any prison services, programs or activities by reason of his disability. *See Currytto v. Furey*, No. 3:18-CV-01696 (JAM), 2019 WL 1921856, at *4 (D. Conn. Apr. 30, 2019) (Where "[the plaintiff's] complaint goes to the inadequacy of treatment for his disability rather than discriminatory action motivated by his disability, [the plaintiff] has failed to allege a plausible claim for relief under the ADA." (internal citation omitted)); *Nails v. Laplante*, 596 F. Supp. 2d 475, 481–82 (D. Conn. 2009) (dismissing inmate's ADA claim because the complaint "d[id] not include any non-conclusory allegations of discriminatory animus or ill will based on his disability and identifie[d] no program he could not participate in or any service that was denied as a result of his disability").

### B. The Fourteenth Amendment Equal Protection Claim

To prevail on an equal protection claim, a plaintiff must prove that he was treated differently from other similarly situated individuals, and that the reason for the different treatment was based on "impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *See Diesel v. Town of Lewisboro*, 232 F.3d 92, 103 (2d Cir. 2000) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980)).

A plaintiff may bring a "class of one" equal protection claim "where the plaintiff alleges that [he or she] has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (internal quotation omitted). In the Second Circuit, a class-of-one plaintiff "must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006) (citation omitted). The similarity between the plaintiff and comparators provides "an inference that the plaintiff was intentionally singled out for reasons that so lack any reasonable nexus with a legitimate governmental policy that an improper purpose—whether personal or otherwise—is all but certain." *See Witt v. Vill. of Mamaroneck*, No. 12-CV-8778 (ER), 2015 WL 1427206, at *5 (S.D.N.Y. Mar. 27, 2015), *aff'd.*, 639 F. App'x 44 (2d Cir. 2016) (quoting *Neilson v. D'Angelis*, 409 F.3d 100, 105 (2d Cir. 2005)).

The Court construes Mr. Henderson's Complaint as asserting violations of his Fourteenth Amendment equal protection rights because he claims to have been treated differently than other inmates with regard to his requests for a mattress to relieve his back pain and for a single cell due

to his sleep apnea. Compl. ¶¶ 2, 52, 70.

Mr. Henderson's allegations do not suggest that he has been discriminated against based upon impermissible considerations such as race, national origin, religion, or any other suspect class. Moreover, he has not alleged a plausible "class of one" equal protection claim. He alleges that inmates Marra and Dunbar received double mattresses before January 1, 2017, and that inmate Terence received a single cell. *Id.* ¶¶ 52, 70. These allegations fail to raise any inference, however, that the named individuals were so similarly situated to Mr. Henderson as to raise an inference that no rational basis exists for the differential treatment. *See Gray v. Bansley/Anthony/Burdo LLC*, No. 3:19-CV-1869 (KAD), 2020 WL 292230, at *5 (D. Conn. Jan. 21, 2020) (dismissing prisoner complaint on initial review where allegations did not "show an extremely high degree of similarity between [plaintiff] and the persons to whom [h]e compare[s] [himself]" (alteration in original) (internal citation omitted)).

Accordingly, Mr. Henderson's Fourteenth Amendment equal protection claim will be dismissed. *See* 28 U.S.C. § 1915A.

### C. The Official Capacity Claims

In *Ex parte Young*, 209 U.S. 123 (1908), the United States Supreme Court recognized a limited exception to the Eleventh Amendment's grant of sovereign immunity from suit to permit a plaintiff to sue a state official acting in an official capacity for prospective injunctive relief for continuing violations of federal law. *Id.* at 155–56; *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 372 (2d Cir. 2005). "A plaintiff may sue a state official acting in his official capacity—notwithstanding the Eleventh Amendment—for 'prospective injunctive relief' from violations of federal law." *In re Deposit Ins. Agency*, 482 F.3d 612, 617 (2d Cir. 2007) (internal

citation omitted). The exception to Eleventh Amendment immunity, however, "does not permit judgments against state officers declaring that they violated federal law in the past." *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 146 (1993). Further, any claims for money damages against state employees in their official capacities are barred by the Eleventh Amendment. *See*, *e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

Mr. Henderson requests injunctive relief and a declaratory judgment against the Defendants in their official capacities. Specifically, he seeks declarations that Defendants have violated his rights in the past and that the current standard issue mattress is not suitable for long term usage. Compl. ¶¶ 74, 80. He also requests injunctions ordering that he be provided with medical treatment and testing for his back, a suitable mattress or topping, and a single cell so that he may avoid conflicts with cellmates due to his sleep apnea. *Id.* ¶¶ 75, 76, 79.

Mr. Henderson may proceed against a DOC official in his or her official capacity only to the extent he alleges an ongoing constitutional violation. *See Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254–55 (2011) (citing *Ex parte Young*, 209 U.S. 123 (1908)). Mr. Henderson, however, has not alleged any continuing constitutional or federal law violation against any of the named defendants. As a result, his claims for declaratory and injunctive relief must be dismissed. *See Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 406–07 (S.D.N.Y. 2010) (requests for injunctive relief are remedies and dismissed with the underlying claim).

Accordingly, Mr. Henderson's official capacity claims will be dismissed. *See* 28 U.S.C. § 1915A.

### D.  The Connecticut Constitution, Article First, §§ 8 and 9 Claim

Article First, § 8 provides in pertinent part: "No person shall be . . . deprived of life, liberty or property without due process of law . . . ." Conn. Const. art. 1, § 8. Article First, § 9 provides that "[n]o person shall be arrested, detained or punished, except in cases clearly warranted by law." Conn. Const. art. I, § 9.

In *Binnette v. Sabo*, 244 Conn. 23 (1998), the Connecticut Supreme Court recognized a private cause of action for monetary damages against municipal police officers for violations of Article First, §§ 7 and 9 of the Connecticut Constitution arising from unreasonable search and seizure and unlawful arrest. *Id.* 41–47. In reaching its decision, the Connecticut Supreme Court relied on *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and "emphasize[d] that [its] decision to recognize a *Bivens*-type remedy in this case does not mean that a constitutional cause of action exists for every violation of our state constitution." *Id.* at 47.

Mr. Henderson asserts a claim under Article First, §§ 8 and 9 of the Connecticut Constitution for cruel and unusual punishment based on failure to provide him with a suitable mattress to relieve his back pain and to provide him with a single cell due to his sleep apnea.

Mr. Henderson's claims present new contexts for a cause of action under the Connecticut Constitution. *Cf. Woolard v. Santiago*, No. 3:19-CV-1256 (VLB), 2020 WL 2079533, at *11 (D. Conn. Apr. 30, 2020) (private right of action under Article First, § 9 for punishment suffered by inmate during confinement at state prison facility is not established); *Gothberg v. Town of Plainville*, 148 F. Supp. 3d 168, 187–88 (D. Conn. 2015) (declining to exercise supplemental jurisdiction over state constitutional claim under Article First, § 8); *see also Lopez v. Smiley*, 375

F. Supp. 2d 19, 26 (D. Conn. 2005) (refraining from exercising supplemental jurisdiction over novel and undeveloped state constitutional claims under Article I). Because these claims are undeveloped under Connecticut law, the Court declines to exercise supplemental jurisdiction over these claims brought under the Connecticut Constitution. *See* 28 U.S.C. § 1367(c); *cf. Conley v. Alexander*, No. 3:18-CV-294 (VAB), 2020 WL 1514834, at *6 (D. Conn. Mar. 30, 2020); *Stevenson v. Quiros*, No. 3:20-CV-01518 (VLB), 2020 WL 7188607, at *7 (D. Conn. Dec. 7, 2020).

Accordingly, Mr. Henderson's claims under Article First, §§ 8 and 9 of the Connecticut Constitution will be dismissed.

**ORDERS**

For the foregoing reasons, the Complaint is **DISMISSED** without prejudice under 28 U.S.C. §1915A.

The Court will afford Plaintiff one opportunity to file an Amended Complaint, by **December 19, 2021**, to assert claims for relief that comply with Federal Rule of Civil Procedure 8 and this Order. Plaintiff is advised that any Amended Complaint will completely replace the prior complaint in the action, and that no portion of any prior complaint shall be incorporated into his Amended Complaint by reference. Plaintiff must name every defendant against whom he asserts claims in the case caption. Failure to file an Amended Complaint by **December 19, 2021** will result in the closing of this case.

**SO ORDERED** at Bridgeport, Connecticut, this 17th day of November, 2021.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE