## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

BILL ROY HENDERSON,
*Plaintiff,*

v.                                                              No. 3:21-cv-1078 (VAB)

ANGEL QUIROS, et al.
*Defendants.*

## RULING ON MOTION FOR SUMMARY JUDGMENT

In this action, Bill Roy Henderson, a sentenced inmate confined within the custody of the

Connecticut Department of Correction ("DOC") at Corrigan-Radgowski Correctional Center

("Corrigan"), asserts Eighth Amendment claims against Dr. Ingrid Feder, in her individual and

official capacities, and against Warden Martin, in his official capacity.[1]

Defendants filed a motion for summary judgment on Mr. Henderson's claims against Dr.

Feder and Warden Martin. Motion for Summary Judgment, ECF No. 21 (June 30, 2023)

(hereinafter "Mot. for Summ. J."). Mr. Henderson filed a memorandum in opposition to

Defendants' motion for summary judgment. Memorandum in Opposition, ECF No. 27 (Aug. 3,

2023) (hereinafter "Pl. Opp.").

For the reasons that follow, the Defendants' motion for summary judgment is

**GRANTED**.

---

[1] The Court may "take judicial notice of relevant matters of public record." *See Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012). The Connecticut DOC website shows that Mr. Henderson was sentenced to sixty years of incarceration on March 22, 2002 and is housed at Corrigan. *See* http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=210215.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Factual Background[2]

The following factual background reflects the Court's review of the Amended Complaint, ECF No. 6 (Dec. 14, 2021) (hereinafter "Am. Compl."),[3] the Defendants' Local Rule 56(a) statements of fact, ECF No. 21-2 (June 30, 2023) (hereinafter "Defs. Rule 56(a)1"),[4] and all supporting materials.

Mr. Henderson alleges an Eighth Amendment violation based on the failure to provide him with adequate medical care for his back pain by prescribing or providing him with a "double mattress," "foam egg crate mattress" topping or a "therapeutic mattress." *See* Am. Compl. ¶ 2.

Mr. Henderson is a sentenced inmate who works as a tier worker during the evening shift at Corrigan. Defs. Rule 56(a)1 ¶¶ 1–2.

---

[2] Generally, the court cites only the relevant paragraph in the Local Rule 56(a)1 Statement where a fact is not disputed. The page numbers cited in this ruling regarding any documents that have been electronically filed refer to the page numbers imprinted by the electronic case filing system on the header of the documents and not to the page numbers of the original documents, if any.

[3] *See Jordan v. LaFrance*, No. 3:18-cv-01541 (MPS), 2019 WL 5064692, at *1 n.1, *4 (D. Conn. Oct. 9, 2019) (a "verified complaint . . . may be considered as an affidavit" for summary judgment purposes); *Walcott v. Connaughton*, No. 3:17-CV-1150, 2018 WL 6624195, at *1, n.1 (D. Conn. Dec. 18, 2018).

[4] Defendants provided Mr. Henderson with a notice in compliance with Local Rule of Civil Procedure 56(b) that informed him of the requirements for filing his papers in opposition to the motion for summary judgment under Local Rule 56. Notice to *Pro Se Litigant*, ECF No. 21-6. Local Rule 56(a)1 provides: "Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted (solely for purposes of the motion) unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule, or the Court sustains an objection to the fact." Local Rule 56(a)3 provides that "each denial in an opponent's Local 56(a)2 Statement[] must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial, or (2) other evidence that would be admissible at trial."

Mr. Henderson titles his opposition as "Local Rule 56(a) Statement of Facts for Plaintiff's Objection to the Defendants[']s Motion for Summary Judgment." Pl. Opp. at 1. But this document contains no responses to Defendants' Local Rule 56(a)1 statements of fact and cites to no evidence in the record. *Id.* Accordingly, it cannot be construed even most broadly as a Local Rule 56(a)2 Statement in compliance with Local Rule 56(a). Thus, the Court considers Defendants' statements in its Local Rule 56(a)1 statement to be admitted where supported by the evidence.

At the time relevant to this matter, an inmate who needed replacement of a defective or damaged mattress was required to submit a request to his unit manager so that the mattress could be observed to determine if a replacement mattress was needed. Defs. Rule 56(a)1 at ¶ 43. The practice of using two mattresses or a "double mattress" presents penological safety and security concerns because an inmate may use the two mattresses to conceal contraband, such as a weapon. *Id.* at ¶ 44. Likewise, an "egg-crate foam mattress," which is highly flammable, also presents penological safety and security concerns in a confined environment like a correctional facility. *Id.*

Dr. Ingrid Feder worked for DOC, primarily at Corrigan, as a physician in a part-time capacity, working generally three days a week from September of 2019 through July of 2021. *Id.* at ¶ 3. Dr. Feder was not Mr. Henderson's sole medical provider. *Id.*

Generally, an inmate with a medical complaint will first meet with nursing staff, who then determines whether an inmate should be placed on the prescriber sick call list (often referred to as the MD Sick Call List) to see a prescriber regarding their concern. *Id.* ¶ 6. Inmates placed on the prescriber sick call list are seen by one of the medical doctors, physician's assistants, or APRNs seeing patients at the facility, depending on availability or scheduling on a particular day. *Id.*

Pain management is focused on the maintenance of functional abilities. *Id.* ¶ 13. Complete pain alleviation is not a realistic treatment goal. *Id.* The goal is to provide sufficient pain relief to allow the patient to maintain his or her ability to function daily while using the minimum level of medicinal intervention necessary. *Id.*

On March 7, 2020, Mr. Henderson met with a nurse complaining of pain in his lower

back, shoulder, and left leg, pain in his heel where he had previously had surgery, and the ineffectiveness of Tylenol for his pain that he claimed was "probably" due to his mattress. *Id.* ¶ 10; *see* Defs. Ex. A at 1169–70 (medical record under seal), ECF No. 22 (June 30, 2023). The nurse noted that he showed full range of motion in his shoulder with no presence of any clicking sound. *Id.* at 1169. The nurse advised him about stretching exercises as a component of pain management and that Motrin and Tylenol were available for purchase in commissary if needed. *Id.* at 1170. She recommended that he practice daily stretching and utilize warm compresses to ease pain in the affected area and referred him to the prescriber sick call list. *Id.*

During this meeting, the nurse observed that Mr. Henderson had a steady gait, indicating, at least to her, that his symptoms did not adversely impact his ability to walk and move normally absent any invasive treatment to address his complaints of pain. Defs. Rule 56(a)1 ¶ 11; *see* Defs. Ex. A at 1170.

Dr. Feder met with Mr. Henderson about his complaints of back pain on March 11, 2020. Defs. Rule 56(a)1 ¶ 12. Before that date, Dr. Feder had only provided Mr. Henderson with healthcare related to his elevated blood pressure, and she was not previously aware that he experienced back pain. *Id.* ¶¶ 7–8. Mr. Henderson had, however, received prior treatment from other medical providers who had provided him with different pain medications, including Gabapentin, Naproxen, Motrin and Acetaminophen. *Id.* ¶ 9. He was afforded an X-ray on October 31, 2019, that demonstrated no dislocation, fracture, or significant degenerative disease. *Id.*

At his March 11 appointment with Dr. Feder, Mr. Henderson discussed his back pain, heel pain, constipation, and blood pressure. *Id.* ¶ 12; *see* Defs. Ex. A at 1157–1159. Mr.

4

Henderson claimed that he was shot in Jamaica previously and still had the bullet in his body. Defs. Rule 56(a)1 ¶ 12; Defs. Ex. A at 1157. He stated that he could not tolerate Gabapentin, as it made him feel like he was flying, and that he was not taking pain medication at time, although he was very uncomfortable. *Id.*

Dr. Feder observed some decreased range of motion in his right shoulder and some pain on palpation of Mr. Henderson's lower spine. *Id.* Dr. Feder assessed that Mr. Henderson was (1) not suffering from chronic debilitating pain and (2) that a minimal medicinal intervention was appropriate to provide him with some relief in conjunction with the nurse's prior recommendation for stretching exercises and the use of a warm compress. Defs. Rule 56(a)1 ¶ 14. Dr. Feder submitted a referral to an orthopedic specialist for additional examination regarding the cause of Mr. Henderson's subjective complaints of pain and suggested remedies. *Id.* ¶ 12. Dr. Feder also started Mr. Henderson on two pain medications—Meloxicam and Diclofenac gel—both of which he had agreed to try. *Id.*

Dr. Feder claims not to recall any discussion during the March 11, 2020 appointment about Mr. Henderson's mattress. Defs. Ex. B, Dr. Feder decl. ¶ 14, ECF No. 21-4 (June 30, 2023). And the medical record fails to reflect that Mr. Henderson raised a concern about his mattress to Dr. Feder on March 11, 2020. Defs. Rule 56(a)1 ¶ 12; Defs. Ex. A at 1157.

After March 11, 2020, Dr. Feder continued to provide Mr. Henderson with medical care related to his persistent elevated blood pressure, which is a significant health risk that could lead to a stroke, heart attack, or kidney failure. Defs. Rule 56(a)1 ¶ 15. Mr. Henderson's treatment, however, was continually frustrated by his refusal at various times to take his prescribed medication and to permit monitoring of his blood pressure. *Id.* Additionally, Dr. Feder helped

facilitate Mr. Henderson's care and specialist visitations related to a biopsy of his thumbnail, gastrointestinal issues, and oncology follow-up. *Id.* ¶ 16.

In late June 2020, Mr. Henderson complained to the nursing staff about his continued pain and a desire to change his mattress. *Id.* ¶ 17; *see* Defs. Ex. A at 1082–84. Dr. Feder did not meet with Mr. Henderson at this time, and she was not made aware of his continued complaints of pain related to his back or shoulder. Defs. Rule 56(a)1 ¶ 17. Dr. Feder claims that Mr. Henderson needed to be seen at his pending appointment with an orthopedic specialist before alternative medication or intervention plan for his pain could be reasonably developed. Defs. Ex. B ¶ 18.

As a result of Mr. Henderson's meeting with nursing staff in late June 2020, Dr. Feder followed up on a note for review of Mr. Henderson's blood pressure on July 6, 2020. Defs. Rule 56(a)1 ¶ 17; *see* Defs. Ex. A at 1078–1081, 1084.

Thereafter, Dr. Feder continued to provide Mr. Henderson with medical treatment for his elevated blood pressure, including medication changes in response to his continued refusal to take all of his prescribed medications. Defs. Rule 56(a)1 ¶ 19.

In November 2020, Dr. Feder received Mr. Henderson's inmate request form, in which he explained that he learned medical staff can provide him a "medical mattress" and wanted to be placed on a list for one. *Id.* ¶ 20; Defs. Ex. A at 878.

Dr. Feder believes that this was the first instance of Mr. Henderson discussing a mattress accommodation with her. Defs. Ex. B ¶ 22. In a response dated November 9, 2020, Dr. Feder informed Mr. Henderson that she could provide him with a foam core mattress—but not a "double mattress"—and that the foam core mattress was "very hard." Defs. Rule 56(a)1 ¶ 20.

She explained that custody staff is in charge of providing him with the foam core mattress and the medical staff had "let them know" that the foam core mattress would be appropriate for him. *Id.*

Dr. Feder states that a new mattress was not a medical necessity to treat Mr. Henderson, but she believed it would not be harmful for him to determine if a foam core mattress would help alleviate his complaint of continuing pain. Defs. Ex. B ¶ 23.

On November 13, 2020, Mr. Henderson met with the orthopedic specialist, who discussed his medical history and provided him with a physical exam. Defs. Rule 56(a)1 ¶ 22; *see* Defs. Ex. A at 851–54. Mr. Henderson complained about suffering from a gunshot wound in his right upper extremity in the 1970s, indicated that his recent pain began in 2008 when he was playing handball, and described ongoing right shoulder pain which has been waxing and waning since 2008. Defs. Rule 56(a)1 ¶ 22. He explained that he experienced symptom-free periods lasting multiple months, that he was not suffering pain at that time, and that the pain oscillated between dull and sharp. *Id.* He stated that the pain was severe at its worst and could interfere with his job, and that he sleeps on the floor as part of his job. *Id.* In addition, he reported nighttime pain occurring for days every week when he suffers symptoms, but he denied any limitation to his range of motion or strength or any numbness or tingling in his extremities. *Id.*

At this appointment, Mr. Henderson also had an X-ray of his right shoulder that showed mild degenerative joint disease and the bullet overlying Mr. Henderson's right upper lung. *Id.* ¶ 23. The orthopedic specialist recorded Mr. Henderson's physical exam as "completely normal" with no joint tenderness, and that his X-ray was "unremarkable." *Id.* ¶ 24; *see* Defs. Ex. A at 854. The orthopedic specialist recommended that Mr. Henderson take Tylenol and anti-

inflammatories such as ibuprofen, Advil, or Aleve as needed to control his pain. *Id.* He determined that Mr. Henderson did not need follow-up examination with a specialist but indicated that Mr. Henderson "may reach out to his facility if he has recurrence of symptoms and would like to be reevaluated." *Id.*

On November 16, 2020, Dr. Feder reviewed the orthopedic specialist's notes about Mr. Henderson's condition. Defs. Rule 56(a)1 ¶ 25; *see* Defs. Ex. A at 849. Dr. Feder observed that Mr. Henderson's blood pressure continued to be uncontrolled due to his refusal to take particular medications and, therefore, decided to alter his medication regime to a drug that he had requested to take. *Id.* Dr. Feder noted that he could not have non-steroidal anti-inflammatory drugs ("NSAIDs") until his blood pressure was under control as the NSAIDs "would potentially worsen his hypertension." *Id.*

Dr. Feder also provided Mr. Henderson with a written note reflecting her review; in it, she explained that the specialist believed he had mild degenerative joint disease and could control his pain with Tylenol or anti-inflammatories as needed. Defs. Rule 56(a)1 ¶ 26; *see* Defs. Ex. A at 848. She advised Mr. Henderson that he could not take Ibuprofen or similar NSAIDs at the time because his blood pressure was still poorly controlled and such medications would worsen his hypertension. *Id.* In addition, she informed him of the blood pressure medication changes she had ordered for him and that he could obtain Tylenol from the facility commissary for his pain if needed. *Id.*

Dr. Feder agreed with the orthopedic specialist that Mr. Henderson's complaints of intermittent pain (that waxed and waned) could be managed through the use of Tylenol and anti-inflammatories (including NSAIDs once his blood pressure was under control). Defs. Rule

56(a)1 ¶ 27. Dr. Feder believes that the observations about Mr. Henderson by the orthopedic specialist and other medical staff and his employment history all suggested that he was able to regularly maintain his functional abilities. Defs. Ex. B ¶ 29. She opines that Mr. Henderson's various examinations evidenced the type of pain associated with mild degenerative joint disease that could be successfully managed through treatment as needed with Tylenol or anti-inflammatories in conjunction with the back exercises and stretches he had previously discussed with medical staff. *Id.*

Thereafter, Dr. Feder received no additional communication from Mr. Henderson regarding his mattress. Defs. Rule 56(a)1 ¶ 28.

On April 25, 2021, Mr. Henderson submitted an inmate request form complaining about his new foam core mattress because it was too hard and made it difficult for him to sleep. Defs. Rule 56(a)1 ¶ 31. He received a response from a nurse that he was added to the nursing sick call list to address his complaint. *Id.*

On May 1, 2021, Mr. Henderson met with a nurse and complained of several medical issues. *Id.* ¶ 32. In a medical note, the nurse documented that Mr. Henderson "had issues" with his new mattress and that she had informed him that his complaint would be forwarded to the nurse supervisor. *Id.*; *see* Defs. Ex. A at 772.

Dr. Feder left her employment with DOC in June 2021 and does not recall any other significant interaction with Mr. Henderson prior to her departure. Defs. Rule 56(a)1 ¶ 29; s*ee* Defs. Ex. B ¶ 31.

On June 25, 2021, Mr. Henderson met with Dr. Brian Rader. Defs. Rule 56(a)1 ¶ 33. They discussed several of Mr. Henderson's ailments, including his back and shoulder pain. *Id.*

Dr. Rader reported that Mr. Henderson expressed that his mattress was "too hard at times." *Id.* Dr. Rader prescribed Mr. Henderson three months of Robaxin, a muscle relaxer. *Id.*

On July 14, 2021, Mr. Henderson wrote to Dr. Rader regarding his mattress. *Id.* ¶ 34. On July 16, 2021, Dr. Rader advised Mr. Henderson that a request for a mattress had been placed and asked that he be patient. *Id.* Dr. Rader also offered to prescribe him with Advil if he wanted it. *Id.*

On December 7, 2021, Mr. Henderson submitted an inmate request form stating that he had been told that the foam core mattress "was no good long before [he] got it," but he "had to try it for [him]self," and he asked that the foam core mattress be taken back. *Id.* ¶ 35; *see* Defs. Ex. A at 430. He received a response informing him that he would be given a refusal form to sign for the foam core mattress. *Id.*

On December 9, 2021 Mr. Henderson executed a refusal form for the foam core mattress. Defs. Rule 56(a)1 ¶ 36; *see* Defs. Ex. A at 413. He later refused the return of a regular mattress and continued to retain the foam core mattress. Defs. Rule 56(a)1 ¶ 36; *see* Defs. Ex. A at 412. On December 16, 2021, Mr. Henderson executed another refusal form for the foam core mattress. Defs. Rule 56(a)1 ¶ 36; *see* Defs. Ex. A at 394. On December 17, 2021, he exchanged his foam core mattress for the regular mattress. Defs. Rule 56(a)1 ¶ 36; *see* Defs. Ex. A at 397.

On December 21, 2021, Mr. Henderson submitted another inmate request form with a complaint about his having to use the regular "brown" mattress again. Defs. Rule 56(a)1 ¶ 37; *see* Defs. Ex. A at 379. A response from medical staff advised him that he could only be provided with the foam core mattress that he had previously rejected and that "[a]ny other mattresses requested come from the counselor/co's." *Id.*

10

On March 11, 2022, Mr. Henderson met with an in-house orthopedic specialist primarily for his complaints of heel pain. Defs. Rule 56(a)1 ¶ 38; *see* Defs. Ex. A at 178. At this appointment, he also complained about suffering from spinal problems related to his mattress. *Id.* The orthopedic specialist made no recommendation for a particular treatment for his back pain complaint. *Id.*

On March 30, 2022, Dr. Rader met with Mr. Henderson as a follow up for his back pain complaint. Defs. Rule 56(a)1 ¶ 39. The medical note reflects that Mr. Henderson inquired about a back brace to help relieve his pain; Dr. Rader made a notation that he would consult with the orthopedist; and Dr. Radar advised Mr. Henderson to consider stopping his "tierman work" if his pain was "so great." Defs. Ex. A at 130.

On April 22, 2022, Mr. Henderson was provided with a soft Velcro wrap for lumbar support. Defs. Rule 56(a)1 ¶ 40; *see* Defs. Ex. A at 105.

The medical record reflects no complaint from Mr. Henderson specific to his back pain or mattress after his March 2022 communications and receipt of a back brace in April 2022. Defs. Rule 56(a)1 ¶ 41.

In September 2022, Corrigan replaced all of its batting-filled mattresses with new foam core mattresses. *Id.* ¶ 42. Mr. Henderson's mattress was replaced with one of the new foam-core mattresses on September 14, 2022. *Id.*

### B.    Procedural Background

On August 10, 2021, Mr. Henderson brought this *pro se* action under 42 U.S.C. § 1983. *See* Compl., ECF No. 1 (Aug. 10, 2021).[5]  In it, he alleged that Commissioner Angel Quiros,

---

[5] Mr. Henderson paid the filing fee on August 12, 2021.

Corrigan Warden Robert Martin, Dr. Gerald Valletta, Lieutenant Jusamme, Dr. Johnny Wu, and Dr. Ingrid Feder violated his rights under the United States Constitution's Eighth and Fourteenth Amendments and the Connecticut Constitution, Article First, Sections 8 and 9. *See id* ¶¶ 2–13, 68–73.

More specifically, Henderson alleged that Defendants displayed deliberate indifference to his serious medical needs by not issuing him a suitable mattress or mattress topping for his back pain, and by denying him a single cell that he needed due to his sleep apnea. *See id.* ¶ 2. He also asserted Fourteenth Amendment Equal Protection Clause violation based on the denial of the suitable mattress and single cell. *Id.* Mr. Henderson requested damages, declaratory judgment, and injunctive relief. *Id.* at 14.

After initial review, the Court dismissed Mr. Henderson's Complaint for failure to state any plausible claims, but it permitted him to file an Amended Complaint to correct the deficiencies identified in the Court's Initial Review Order. Initial Review Order, ECF No. 5 (Nov. 17, 2021) (hereinafter "IRO").

Mr. Henderson filed an Amended Complaint against the same Defendants, asserting deprivation of a suitable mattress or mattress topping in violation of the Eighth and Fourteenth Amendments and the Connecticut Constitution, Article First, Sections 8 and 9. Am. Compl. ¶¶ 2–13, 56–63, ECF No. 6 (Dec. 14, 2021). After a review of the Amended Complaint, consistent with the Court's duty to screen prisoner complaints under 28 U.S.C. § 1915A, the Court concluded that Mr. Henderson stated plausible Eighth Amendment claims against Dr. Wu and Dr. Feder in their individual and official capacities and against Warden Martin in his official capacity. Initial Review Order of Am. Compl. at 18–19, ECF No. 7 (July 22, 2022) ("IRO of

Am. Compl.").

On October 28, 2022, Defendants filed a motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss Mr. Henderson's Eighth Amendment claim against Dr. Wu, arguing the claim was barred by the statute of limitations. Defs. Mot. to Dismiss, ECF No. 15 (Oct. 28, 2022); Defs. Mem. of Law in Support of its Mot. to Dismiss, ECF No. 15-1 (Oct. 28, 2022) ("Mot."). After review of the motion to dismiss and absent a timely objection, the Court granted the motion and dismissed all claims against Dr. Wu. Ruling on Mot. to Dismiss, ECF No. 16 (Mar. 10, 2023).

On June 30, 2023, Defendants filed a motion for summary judgment on the remaining Eighth Amendment claims against Dr. Feder in her individual capacity and official capacities, and Warden Martin in his official capacity only. Mot. for Summ. J.. Defendants filed a motion to seal the evidentiary documents submitted in Exhibit A, which the Court granted under Local Rule 5(e) on July 4, 2023. Order, ECF No. 23; Mot. to Seal, ECF No. 20 (June 30, 2023). Thus, Defendants' Exhibit A remains under seal.

The Court afforded Mr. Henderson an extension of time until August 31, 2023, to file his memorandum in opposition to Defendants' motion for summary judgment. Order, ECF No. 25 (July 12, 2023); Mot. for Ext. Time, ECF No. 24 (July 7, 2023).

On August 3, 2023, Mr. Henderson filed his memorandum in opposition to the motion for summary judgment. Pl. Opp.

## II.     STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue

13

as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–48 (emphasis in the original).

"'[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)). "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (citation omitted). The party opposing the motion for summary judgment "must come forward with specific

evidence demonstrating the existence of a genuine dispute of material fact." Id. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

When deciding a motion for summary judgment, a court may review the entire record, including the pleadings, depositions, answers to interrogatories, admissions, affidavits, and any other evidence on file to determine whether there is any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c); *Pelletier v. Armstrong*, No. 3:99-cv-1559 (HBF), 2007 WL 685181, at *7 (D. Conn. Mar. 2, 2007). In reviewing the record, a court must "construe the evidence in the light most favorable to the non-moving party and to draw all reasonable inferences in [their] favor." *Gary Friedrich Enters., L.L.C. v. Marvel Characters, Inc.*, 716 F.3d 302, 312 (2d Cir. 2013) (citation omitted). If there is any evidence in the record from which a reasonable factual inference could be drawn in favor of the non-moving party for the issue on which summary judgment is sought, then summary judgment is improper. *See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.,* 391 F.3d 77, 83 (2d Cir. 2004).


## III.    DISCUSSION

Defendants argue that Mr. Henderson's Eighth Amendment claim for damages against Dr. Feder fails on the merits, or alternatively, she is shielded by qualified immunity; and that Mr. Henderson is not entitled any injunctive relief for his official capacity claims against Dr. Feder and Warden Martin.

The Court agrees that Mr. Henderson's Eighth Amendment individual and official

capacity claims should be dismissed.

### A. The Eighth Amendment Claim Against Dr. Feder in Her Individual Capacity

"The Eighth Amendment prohibits 'deliberate indifference to serious medical needs of prisoners,' which includes needs for mental health care." *Spavone v. N.Y. Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104–105 (1976)). To state a claim for deliberate indifference to a serious medical need, a plaintiff's claim must satisfy both objective and subjective elements. *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). First, the alleged deprivation "must be, in objective terms, sufficiently serious." *Id.* (quotations and citations omitted). "Second, the charged official must act with a sufficiently culpable state of mind." *Id.*

Under the objective prong, the inmate's medical need or condition must be "a serious one." *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003). Factors relevant to the seriousness of a medical condition include whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citations omitted). Moreover, "the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993).

To satisfy the second subjective prong, a prison official or medical staff member must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his or her actions or inactions. *See Salahuddin v. Goord*, 467 F.3d 263, 279–80 (2d Cir. 2006)."[M]ere medical malpractice is not tantamount to deliberate indifference," unless "the

malpractice involves culpable recklessness, i.e., a conscious disregard of a substantial risk of serious harm." *Chance*, 143 F.3d at 703 (internal quotation marks and citation omitted). Further, "mere disagreement over the proper treatment does not create a constitutional claim," and "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Id.*; *see also Hathaway*, 37 F.3d at 70 ("We do not sit as a medical board of review. Where the dispute concerns not the absence of help but the choice of a certain course of treatment, or evidenced mere disagreement with considered medical judgment, we will not second guess the doctors."). Whether a course of treatment was the product of sound medical judgment, negligence, or deliberate indifference depends on the facts of the case." *Chance*, 143 F.3d at 703.

Because "sleep is critical to human existence, and conditions that prevent sleep have been held to violate the Eighth Amendment," a prisoner can raise a constitutional claim that his mattress is "so inadequate as to constitute an unconstitutional deprivation." *See Walker v. Schult*, 717 F.3d 119, 127 (2d Cir. 2013). To establish an Eighth Amendment claim alleging a deficient mattress, courts have required a prisoner plaintiff to allege either (1) a medical condition requiring a non-standard mattress to protect against further serious damage to the prisoner's health or (2) a medical condition caused by the inadequate mattress. *See Jones v. City of New York*, No. 18-CV-1937 (VSB), 2020 WL 1644009, at *7 (S.D.N.Y. Apr. 2, 2020) (citing cases).

Even assuming that Mr. Henderson suffered from serious back pain or other sufficiently serious medical condition requiring a special mattress that satisfies the Eighth Amendment's objective element, no evidence in the record suggests that Dr. Feder acted with deliberate indifference to any of his medical needs.

The medical record demonstrates that Dr. Feder reviewed Mr. Henderson's medical background when she first met with him on March 11, 2020. Defs. Ex. A at 1156–59. Relevant to this action, the medical note for that appointment shows that Dr. Feder recorded that he was "very uncomfortable," had right shoulder and back pain, was not taking any pain medications, had some range of motion loss in his right shoulder, and had pain in his lower spine/paraspinal muscles. *Id.* at 1157. The medical note also reflects that she discussed, and prescribed him with, Meloxicam and Diclofenac gel medications, and she submitted a request for orthopedic evaluation for him. *Id.*

On November 9, 2020, Dr. Feder responded to Mr. Henderson's inmate request dated November 4, 2020, stating that he wanted to be placed the list for a medical mattress and that he had "been fighting for a [medical mattress] or a double mattress since 2005." *Id.* at 878. She advised him that there was a foam core mattress that he could have that was "very hard" and that the medical staff had let DOC custody staff know that this mattress was appropriate for him. *Id.*

On November 16, 2020 Dr. Feder provided Mr. Henderson with a written review of the orthopedic specialist's finding that he was suffering from mild degenerative joint disease, and that he did not require intervention except for the use of Tylenol or other NSAIDs. *Id.* at 848. She advised him not to use NSAIDs due to his blood pressure issues but that he could use Tylenol available at the commissary. *Id.*

This medical record clearly demonstrates that Dr. Feder provided Mr. Henderson with responsive medical treatment and even made a foam core mattress available to him, although he later refused to retain this mattress. *See* Defs. Rule 56(a)1 ¶¶ 12–21, 25–26, 36. The record raises no suggestion that Dr. Feder acted with conscious disregard to his complaints of pain, his

medical needs, or his even request for a special mattress. Nor is there any evidence that Dr. Feder could have provided him with a double mattress or egg crate topping in light of penological safety and security concerns. *See Davis v. Supervisor*, No. 3:21-CV-00648 (SVN), 2022 WL 3681558, at *6 (D. Conn. Aug. 25, 2022) (dismissing claims against defendant where there was no indication that she could have provided him with more timely treatment or provision of his medication); *Blaine v. Burnes*, No. 3:20CV1039 (KAD), 2020 WL 5659101, at *7 (D. Conn. Sept. 23, 2020) (dismissing claim against defendant where alleged facts failed to suggest that he had an ability to ensure Plaintiff was provided with certain medical treatment). *See* Defs. Rule 56(a)1 ¶ 44.

To the extent that Mr. Henderson is arguing that Dr. Feder should have provided him with different treatment, that argument is simply a disagreement with Dr. Feder's medical judgment. But an inmate's preference for certain medical treatment does not give rise to a constitutional claim. S*ee Chance*, 143 F.3d at 703 ("[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *see also Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011) (prisoner's claim that Motrin medication was insufficient and he required stronger pain medication did not state a claim of deliberate indifference). Likewise, Mr. Henderson's belief that he should have been provided a better or specialized mattress sooner "does not create a deprivation of constitutional dimension." *Perry v. Furey*, No. 3:18CV1709 (KAD), 2020 WL 59941, at *6 (D. Conn. Jan. 6, 2020) (noting inmate's belief that he should have been provided with treatment sooner or more frequently did not support deprivation of constitutional dimension).

A medical provider may act, however, with deliberate indifference by consciously

providing an inmate with "an easier and less efficacious" treatment plan, particularly if the provider does so because of ulterior motives, such as improper monetary incentive. *Chance*, 143 F.3d at 703–04; *see also Braham v. Perelmuter*, No. 3:15-CV-1094 (JCH), 2017 WL 3222532, at *16–17 (D. Conn. July 28, 2017) (denying motion for summary judgment because a reasonable juror could infer "that the defendant-dentist had chosen an unsound—but easier—treatment route by extracting several of the plaintiff's teeth rather than by trying to restore them, despite the possibility that extraction could result in the plaintiff's losing more teeth."). There is no evidence in the record, however, that Dr. Feder rendered her medical treatment decisions for an improper purpose or for some monetary incentive.

Thus, on this record, no reasonable jury could determine that Dr. Feder violated Mr. Henderson's Eighth Amendment rights by acting with deliberate indifference to his medical need for a special mattress or his back pain.

Accordingly, Defendants' motion for summary judgment on Mr. Henderson's Eighth Amendment claim against Dr. Feder in her individual capacity will be granted.[6]

## B.  The Eighth Amendment Claim Against Dr. Feder and Warden Martin in Their Official Capacities

On initial review, the Court dismissed as not plausible Mr. Henderson's claims for

---

[6] Even if Mr. Henderson's deliberate indifference claim had survived this legal analysis, based on this record, qualified immunity would have attached to otherwise dismiss this claim. "Qualified immunity protects public officials from liability for civil damages when one of two conditions is satisfied: (a) the defendant's actions did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that [her] action did not violate such law." *Garcia v. Does*, 779 F.3d 84, 92 (2d Cir. 2015) (quoting *Russo v. City of Bridgeport*, 479 F.3d 196, 211 (2d Cir. 2007)). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what [she] is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015). There is nothing in this record to suggest that the law was sufficiently clear that the care provided to Mr. Henderson by Dr. Feder constituted deliberate indifference to his medical needs. Moreover, on this record, it is "objectively reasonable" for Dr. Feder to believe that the medical care provided did not violate the law.

declaratory judgment and damages against Defendants in their official capacities. IRO of Am. Compl. at 15–16. The Court permitted Mr. Henderson to proceed on his claim for injunctive relief for a double or therapeutic mattress or egg crate topping and an MRI diagnosis. *Id.* at 16. But Mr. Henderson admits that he no longer needs a specialized mattress. Pl. Opp. at 8.

As the record fails to raise an issue of fact that he is presently subject to any Eighth Amendment violation arising from his back or shoulder pain or need for a specialized mattress, Mr. Henderson cannot show that he is entitled to a remedy for any continuing Eighth Amendment violation. *Pagan v. Gagne*, No. 3:21-CV-01490 (KAD), 2023 WL 3791804, at *8 (D. Conn. June 2, 2023) (noting "Plaintiff could not sustain any official capacity claims against Defendants because the record [on summary judgment] does not establish an Eighth Amendment violation."); *Chiste v. Hotels.com L.P.*, 756 F. Supp. 2d 382, 406–07 (S.D.N.Y. 2010) (requests for injunctive relief are remedies and are dismissed with the underlying claim). Thus, the Court must grant the motion for summary judgment on Plaintiff's request for official capacity relief for ongoing Eighth Amendment violation.

## CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment is **GRANTED** [ECF No. 21].

The Clerk of Court is respectfully directed to enter judgment in Defendants' favor and to close this case.

**SO ORDERED** at New Haven, Connecticut, this 19th day of January, 2024.

/s/ Victor A. Bolden

VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE